UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION


BRANDON A.,[1]

        Plaintiff,

   v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,


        Defendant.

Case No. 1:18-cv-01390-YY

OPINION AND ORDER


YOU, Magistrate Judge:

    Brandon A. ("plaintiff") seeks judicial review of the final decision by the Commissioner

of Social Security ("Commissioner") denying his application for Title II Disability Insurance

Benefits ("DIB") and Social Security Income ("SSI") under the Social Security Act ("Act").

This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C.

§§ 405(g) and 1383(c)(3). Because the Commissioner's decision is not supported by substantial

evidence, it is REVERSED and REMANDED for the immediate calculation and payment of

benefits.

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last name of
the non-governmental party or parties in this case. Where applicable, this opinion uses the same
designation for a non-governmental party's immediate family member(s).

## BACKGROUND

Born in August 1970, plaintiff was 39 years old on the alleged onset date. Tr. 134. He has a high school education and past work experience as a produce clerk and a cart attendant. Tr. 27.

Plaintiff has been diagnosed with ulcerative colitis, major depressive disorder, anxiety disorder, autism spectrum disorder, hoarding disorder, pyoderma gangrenosum, personality disorder, and dysthymic disorder. Tr. 348, 413, 555, 561, 641, 643, 646. Throughout the relevant period, plaintiff's ulcerative colitis caused him to have six bowel movements per day. Tr. 418, 428, 431, 434, 437, 489, 493, 499, 502, 599, 602. At times, plaintiff was having as many as 12 bowel movements per day. Tr. 413, 441, 574, 577. Even when plaintiff was passing six stools per day, he reported making twelve trips to the bathroom "because he [was] afraid that he [would] pass stool with flatus." Tr. 484. Plaintiff testified that he uses the bathroom a lot to ensure that he does not have an accident. Tr. 72-73, 418, 428, 542. Nevertheless, plaintiff still has accidents and has been wearing incontinence underwear for years. Tr. 282, 338, 353.

Plaintiff has struggled to independently care for himself and his home. Plaintiff's treating providers noted that plaintiff had problems with hygiene, and on multiple occasions he presented as malodorous and/or with soiled clothing. Tr. 442, 641, 667, 693-94, 700. Plaintiff never sweeps, mops, or vacuums, and he washes his laundry in a garbage can, despite the fact that his stepmother allows him to use the washing machine in her house across the street. Tr. 338, 561. Plaintiff's family had to stop garbage services to his house because he was using the garbage can to wash his clothes. Tr. 338.

Plaintiff impulsively buys large amounts of any food that he sees on sale, even things that he will never eat and does not have the space for. Tr. 338, 660, 667. His family had to

confiscate his electronic benefit transfer (EBT) card because "he was buying unnecessary items and they were rotting all over his yard and house." Tr. 338. Plaintiff also collects items out of dumpsters and stores them in his house. Tr. 339. Plaintiff's house can be smelled from the street, and electricians and plumbers have refused to enter due to the smell. Tr. 338, 667.

Plaintiff has no friends. Tr. 341, 561, 682. He has deficits in social skills, nonverbal communication, and developing and understanding relationships, as well as difficulty interacting with others. Tr. 339, 341, 349, 560-62, 682. His family reported that if a woman pays any attention to him "he takes it way out of context and will stalk them and follow them around." Tr. 339, 341. Plaintiff also exhibited an "inflexible adherence to routines," and he and his family reported that he could not handle changes to his routine "at all." Tr. 282, 299, 682.

## PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on November 13, 2014, alleging disability beginning September 20, 2009. Tr. 13. His application was denied initially and upon reconsideration. *Id.* On April 21, 2017, a hearing was held before an Administrative Law Judge ("ALJ"), wherein plaintiff was represented by counsel and testified, as did a vocational expert ("VE"). Tr. 38-88. At the hearing, plaintiff amended his alleged onset date to May 12, 2010. Tr. 13. On June 22, 2017, the ALJ issued a decision finding plaintiff not disabled within the meaning of the Act. Tr. 13-29. After the Appeals Council denied his request for review, plaintiff filed a complaint in this court. Tr. 1-6. The ALJ's decision is therefore the Commissioner's final decision subject to review by this court. 20 C.F.R. § 422.210.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C.

§ 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion and "'may not affirm simply by isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*, 759 F.3d 995, 1009-10 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). The reviewing court may not substitute its judgment for that of the Commissioner when the evidence can reasonably support either affirming or reversing the decision. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Instead, where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted); *see also Lingenfelter*, 504 F.3d at 1035.

## SEQUENTIAL ANALYSIS AND ALJ FINDINGS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. This sequential analysis is set forth in the Social Security regulations, 20 C.F.R. §§ 404.1520, 416.920, in Ninth Circuit case law, *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006) (discussing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)), and in the ALJ's decision in this case, Tr. 14-15.

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity after the alleged onset date. Tr. 15.

At step two, the ALJ found that plaintiff has the following severe impairments: ulcerative colitis, major depressive disorder, anxiety disorder, autism spectrum disorder, and hoarding disorder. *Id.*

At step three, the ALJ found plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Tr. 16. The ALJ next assessed plaintiff's residual functional capacity ("RFC") and determined that he could perform a full range of work at all exertional levels with the following limitations: he could occasionally climb ladders and scaffolds, he requires ready access to a restroom and three unscheduled five-minute restroom breaks (in addition to normal breaks), he is limited to simple, routine tasks consistent with a reasoning level of two and unskilled work, and he is limited to occasional interaction with the public. Tr. 18.

At step four, the ALJ found plaintiff could not perform his past relevant work as a produce clerk or cart attendant. Tr. 27.

At step five the ALJ determined that plaintiff could perform jobs that exist in significant numbers in the national economy, including janitor, auto detailer, and laundry folder. Tr. 27-28.

## DISCUSSION

Plaintiff argues that the ALJ: (1) improperly discounted his subjective symptom testimony; (2) erroneously assessed the medical opinion of examining physician Dr. Cole; (3) improperly rejected the lay witness testimony of his stepmother, stepbrother, and Charlotte S.; (4) erroneously performed the Listings analysis; and (5) improperly crafted the RFC to include limitations that would be considered accommodations under the ADA.

## I. Subjective Symptom Testimony

When a claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) (citation omitted). A general assertion that the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted). If the "ALJ's credibility finding is supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citation omitted).

Effective March 28, 2016, the Commissioner superseded Social Security Ruling ("SSR") 96-7p, governing the assessment of a claimant's "credibility," and replaced it with SSR 16-3p. *See* SSR 16-3p, *available at* 2016 WL 1119029. SSR 16-3p eliminates the reference to "credibility," clarifies that "subjective symptom evaluation is not an examination of an individual's character," and requires the ALJ to consider all of the evidence in an individual's record when evaluating the intensity and persistence of symptoms. *Id.* at *1-2. The ALJ must examine "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and

other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4.

## A. Effective Treatment

In rejecting plaintiff's testimony, the ALJ relied on several treatment notes stating that plaintiff's ulcerative colitis was in remission. Tr. 20-21. As an example, the ALJ cited a chart note from February 2013 in which Dr. Maveety "noted that [plaintiff] had done relatively well on Remicade and continued to have about six bowel movements per day." Tr. 21.

Contrary to the ALJ's conclusion, Dr. Maveety's assessment actually supports plaintiff's testimony. The fact that Dr. Maveety considered six bowel movements per day to be doing "relatively well" is consistent with plaintiff's description of his condition. Plaintiff explained that when his ulcerative colitis was in remission, it was "very good" in comparison to when it was not in remission, but it was still "not what anyone would consider to be normal or desirable." Tr. 69. Plaintiff explained that even when in remission, he did not have full control over his bowels. *Id.* Before taking Remicade, he was losing a pound a day and experiencing bloody diarrhea. *Id.* He also explained that before he was on Remicade he was "running to the bathroom" a dozen times per day, but on Remicade he was walking swiftly to the bathroom half a dozen times per day. Tr. 60. Moreover, Dr. Maveety noted that "despite taking Remicade," plaintiff still "had trouble with loose urgent stools."[2] Tr. 488. Accordingly, Dr. Maveety's characterization of plaintiff's ulcerative colitis is consistent with plaintiff's claims.

The ALJ also relied on a treatment note from June 2016 in which Dr. Volpi found that plaintiff's colitis was "well controlled on Remicade." Tr. 598. However, plaintiff was having

---

[2] Dr. Maveety noted that plaintiff also had "tried a number of additional treatments including psyllium, Lialda, metronidazole, prednisone, colestipol and Imodium" but they "have been ineffective in treating the frequent stools." Tr. 484.

six stools per day throughout 2016. Tr. 599, 602, 604. Therefore, "well controlled" merely reflects that plaintiff was experiencing six bowel movements per day, which as explained above, is consistent with his testimony.

The ALJ further found that plaintiff had "some improvement in his mental symptoms with therapy and medication management." Tr. 22. However, that a person who suffers from severe mental impairments "makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace." *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001).

The Commissioner argues that plaintiff's depression was effectively controlled with medication. Def. Br. 5, ECF #18 (citing *Warre ex rel E.T. IV v. Comm'r Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006)). This contention is not born out by the record. In July 2015, plaintiff's therapist noted that plaintiff had been depressed for "at least 5 years" and that he was depressed "more days than not." Tr. 640. Two months later, plaintiff was still depressed and having suicidal ideation. Tr. 658. In October 2015, plaintiff was feeling hopeless and reported "chronic, daily, passive thoughts of suicide." Tr. 669. Plaintiff had previously been diagnosed with persistent depressive disorder, and at the October 2015 appointment, Dr. Jenson diagnosed plaintiff with major depressive disorder. *Id.*

The Commissioner cites a November 2015 treatment record in which plaintiff said he had more hope and less thoughts of suicide. Def. Br. 5, ECF #18 (citing Tr. 673). Nevertheless, that same date, plaintiff reported that he had not noticed a difference in his depressed mood or anxiety. Tr. 673. The Commissioner also relies on the fact that Dr. Jenson opined plaintiff had experienced a "fair response" to antidepressants. Def. Br. 5, ECF #18 (citing Tr. 675).

However, a "fair response" does not indicate significant improvement. *See Holohan*, 246 F.3d at 1205.

Additionally, in 2016, plaintiff continued to experience "depressed mood, hopelessness, [and] isolation." Tr. 679. Although Dr. Jenson had doubled plaintiff's dosage of Wellbutrin, plaintiff reported that even the double dose was "not really helping." *Id.* Plaintiff felt "worthless and hopeless" and continued to have suicidal ideation. Tr. 682. Plaintiff's therapist assessed that there was "some risk" of suicide attempt. Tr. 685. In early 2017, plaintiff continued to report feeling depressed, and told his therapist that he did not care whether he lived or died. Tr. 693. Accordingly, despite the slight improvement that occurred briefly in November 2015, the record reflects that plaintiff's depression was not effectively treated. *See Garrison*, 759 F.3d at 1017 (the ALJ may not merely cherry-pick isolated inconsistencies with the objective medical record to discount a plaintiff's entire symptom testimony).

Finally, the Commissioner relies on a March 2017 treatment note where plaintiff reported that his hoarding had improved and he was cleaning his house "somewhat." Tr. 697. Again, the fact that there was some degree of improvement does not establish that plaintiff's impairment was under control. *Holohan*, 246 F.3d at 1205. Moreover, at that same appointment, Dr. Jenson assessed that plaintiff's hoarding was still a problem, and a few weeks later plaintiff acknowledged that his house was "still trashy." Tr. 700. Therefore, the ALJ's finding that plaintiff's impairments were effectively treated is not a clear and convincing reason for discounting plaintiff's subjective symptom testimony.

### B. Failure to Seek Treatment

The ALJ found that the "record does not reflect significant mental health treatment until somewhat recently, beginning in July 2015." Tr. 22. While plaintiff may have delayed seeking

mental health treatment, the Ninth Circuit has criticized reliance on a lack of treatment as a basis to reject mental health complaints, opining that "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996).

Moreover, the record reveals that plaintiff lacks insight into his mental impairments. In fact, his insight and judgment have been repeatedly assessed as fair. Tr. 642, 675, 685, 698. Plaintiff's stepmother explained that plaintiff thinks he is smarter than everyone else and does not fully comprehend his mental disabilities. Tr. 339. Moreover, plaintiff believed he did not have any problems with communication, although Dr. Cole opined plaintiff had "problems interacting with others," plaintiff was referred to a case manager for skills training in communication, and plaintiff's therapist assessed that he had "deficits in emotional reciprocity, abnormal social approach, [and] failure to initiate/respond to social interactions." Tr. 349, 647, 656, 682.

The ALJ also found that plaintiff's failure to seek further work-up with Dr. Maveety tended "to undermine his allegation regarding the[] severity and limiting effects [of his impairments]." Tr. 21. The record reflects that Dr. Maveety had been treating plaintiff for over three years, during which time plaintiff continued to suffer from symptoms of ulcerative colitis. Tr. 419. Dr. Maveety could not find objective evidence of active ulcerative colitis, despite plaintiff's persistent symptoms. *Id.* Nevertheless, Dr. Maveety recommended that plaintiff continue with treatment for ulcerative colitis. Tr. 419. It is not unreasonable that plaintiff did not seek further testing to verify active ulcerative colitis in 2014, given that a colonoscopy showed active ulcerative colitis in 2013, plaintiff was continuing to experience symptoms of colitis, and he was continuing to receive treatment for colitis. Tr. 419, 598. Furthermore, as

discussed above, the record is consistent with plaintiff's testimony that even when his colitis was in remission, he was experiencing six bowel movements per day. Thus, it is not clear how plaintiff's failure to seek further testing in 2014 undermines his symptom testimony. As such, the purported failure to seek treatment is not a clear and convincing reason for discounting plaintiff's testimony.

### C.  Non-Compliance With Treatment

The Commissioner argues that plaintiff did not attempt a special diet or see a dietician as recommended by his physician. Def. Br. 4, ECF #18. Contrary to this contention, there is no evidence in the record that plaintiff was referred to a dietician or that any of his treating providers recommended he see a dietician. Furthermore, the record reflects that plaintiff did attempt a special diet on several occasions. Tr. 63-66. Despite the fact that the ALJ cut short plaintiff's explanation,[3] it is clear from plaintiff's testimony that he implemented the special diet for travel and other specific short-term purposes. Plaintiff explained that the special diet consisted of eliminating all fruits, vegetables, whole grains, and any other foods high in fiber. Tr. 63-66. He noted that although it was effective in helping him control his bowels for short periods, it was not sustainable in the long term because it was a "very unhealthy diet." Tr. 64.

In sum, plaintiff was essentially presented with a Hobson's choice: either attempt to control his symptoms with an unhealthy diet, or eat a healthy diet and potentially aggravate his symptoms. While a doctor opined that a special diet would be necessary for plaintiff to work,

---

[3] The pertinent portion of the transcript provides:

|           |                                                                           |
|-----------|---------------------------------------------------------------------------|
| Plaintiff: | I mean there was a—when I have to—do, do things like this or travel, you know -. |
| ALJ:      | I'm not asking you about when you travel.                                 |

Tr. 64.

the doctor never stated that such a diet was recommended for plaintiff's long-term health. Notably absent from the record is any actual recommendation from a doctor that plaintiff implement such a diet on a continuing basis. Thus, the record does not support the ALJ's assertion that plaintiff was non-compliant with his treatment.

**D.      Activities of Daily Living**

The ALJ found that plaintiff's activities "belie the alleged severity of both mental and physical symptoms/limitations." Tr. 23. Specifically, the ALJ found the fact that plaintiff goes to the library "belies the alleged frequency and unpredictability of his bowel issues and also indicates he can tolerate occasional public interaction." Tr. 23. However, plaintiff explained that he walked to the library, and it was a short enough distance that he went to the bathroom right before he left home and again as soon as he arrived. Tr. 68. Plaintiff also reported that while he was at the library he went back and forth to the restroom all the time. Tr. 67. Furthermore, the fact that plaintiff went to the library establishes only that he could tolerate being in public, not that he was engaging in social interactions with the staff or other patrons. Plaintiff testified that he read at the library, and there is nothing to indicate that he did any form of socializing.

The ALJ also found that plaintiff's ability to read books about history and science fiction contradicts his claims that he has problems with focus and understanding, and that his ability to read and play video games undermines his alleged problems with eyesight. Tr. 23. Notably, plaintiff did not testify that he had difficulty understanding reading materials. Moreover, the fact that plaintiff is able to read does not necessarily show he did not have problems with concentration or focus. In fact, both plaintiff's therapist and Dr. Jenson rated plaintiff's concentration as poor, and Charlotte S. reported that plaintiff "loses focus very easily." Tr. 338,

640, 667. With regard to his eyesight, plaintiff merely testified that he cannot read or see a computer screen without his glasses, but with his glasses he can see fine. Tr. 69. Thus, plaintiff's testimony about his impaired vision is consistent with his activities.

The ALJ further found that "contrary to [plaintiff's] alleged social difficulties," he "uses Facebook and has contacted at least two high school friends." Tr. 23. However, the ability to post on Facebook is not inconsistent with social difficulties. Also, the fact that plaintiff "contacted" two former high school classmates does not establish that he engaged in any sustained communication with them and it certainly does not demonstrate that plaintiff had any significant ability to interact socially. The record, in fact, reflects that he did not have such ability. Plaintiff's therapist observed that plaintiff had a "lack of social skills." Tr. 679. Charlotte S. described plaintiff as "socially inept" and incapable of making friends. Tr. 339. Plaintiff's stepmother noted that plaintiff is "very regressed socially" and has no friends. Tr. 341. Plaintiff himself reported that he was a loner and had no friends Tr. 561, 682. Additionally, Dr. Cole opined that plaintiff had deficits in social reciprocity, and plaintiff's scores on the Vineland Adaptive Behavior Scales reflected that his adaptive level for socialization was low. Tr. 560-61.

Citing plaintiff's ability to go to the library and the store, the ALJ found that plaintiff's "ulcerative colitis symptoms are not as limiting as alleged" because he is "able to accommodate them well enough to be out of the house regularly." Tr. 23. However, as discussed above, plaintiff's ability to go to the library is not inconsistent with his symptom testimony because he used the bathroom before leaving and upon arriving, and frequently while there. Likewise, plaintiff testified that he always used the bathroom when he went to the store. Tr. 70. Therefore, plaintiff's activities of daily living are not a proper basis for discounting his testimony.

### E.     RFC

The ALJ found that plaintiff's alleged symptoms are adequately accounted for by the RFC.  Tr. 23.  Noting that plaintiff reported he went to the bathroom every 30 minutes to two hours, the ALJ concluded that plaintiff's bathroom needs were accommodated by the fact the RFC included three unscheduled breaks, as well as regular breaks.  *Id.*  However, the RFC only accounts for the low end of the range reported by plaintiff.  Three unscheduled breaks and three regular breaks provides a total of six breaks.  Plaintiff reported needing to use the restroom every 30 minutes to two hours, which would be four to sixteen times in an eight-hour day.  Thus, the RFC does not adequately accommodate plaintiff's bathroom needs.

The Commissioner argues that Dr. Volpi concluded plaintiff could work with a special diet and "restroom services."  Def. Br. 5, ECF #18.  As explained above, however, despite concluding that plaintiff would require a special diet in order to work, Dr. Volpi did not actually prescribe or recommend such a diet.  Moreover, there is no dispute that plaintiff needs ready access to restroom services to be able to work—the critical question is how many bathroom breaks plaintiff needs.  Dr. Volpi's opinion provides no insight into the number of breaks that plaintiff would require.  As such, Dr. Volpi's opinion does not serve as substantial evidence that the RFC adequately accounts for plaintiff's impairments.

### F.     Inconsistent Statements

The Commissioner argues that plaintiff's function report, in which he stated that he goes to the bathroom every 30 minutes to two hours, is inconsistent with his testimony that he was having six bowel movements per day.  Def. Br. 6, ECF #18.  This argument fails for several reasons.  First, the Commissioner's argument was not relied on by the ALJ, and is therefore an impermissible *post hoc* rationalization.  *Bray v. Commissioner*, 554 F.3d 1219, 1225 (9th Cir.

2009).  Second, the function report was filled out in 2014 and plaintiff testified in 2017; that the frequency at which he was going to the bathroom may have changed over the course of several years does not create an inconsistency in his testimony.  Tr. 38, 283.  Third, despite the fact that throughout most of the relevant period plaintiff consistently reported passing six stools per day, the record clearly establishes that plaintiff often required twice as many trips to the bathroom to avoid accidents.  Tr. 72-73, 418.  Plaintiff's condition created difficulty in differentiating between the need to pass stool and the need to pass gas, resulting in the need for additional trips to the bathroom.  Tr. 70, 418, 542.  Therefore, the fact that plaintiff was having six bowel movements per day in 2017, does not mean that plaintiff was making only six trips to the bathroom per day.

### G.   Lack of Medical Evidence

The only remaining basis for rejecting plaintiff's testimony is the lack of medical evidence.  However, the lack of medical evidence may not be the ALJ's sole reason for discounting a claimant's testimony.  *Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir. 1998) ("[T]he Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.").  Accordingly, even if the lack of medical evidence qualified as a clear and convincing reason, it would not be sufficient because the other reasons the ALJ provided for discounting plaintiff's symptom testimony are not clear and convincing.

## II.   Medical Opinion Evidence

The ALJ is responsible for resolving ambiguities and conflicts in the medical testimony.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  The ALJ must provide clear and convincing reasons for rejecting the uncontradicted medical opinion of a treating or

examining physician, or specific and legitimate reasons for rejecting contradicted opinions, so long as they are supported by substantial evidence. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). However, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012). Additionally, the ALJ may discount physicians' opinions based on internal inconsistencies, inconsistencies between their opinions and other evidence in the record, or other factors the ALJ deems material to resolving ambiguities. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601-02 (9th Cir. 1999).

Plaintiff argues that the ALJ improperly assessed the medical opinion of examining physician Dr. Cole. Dr. Cole provided opinions in 2005, 2015, and 2017. The ALJ gave no weight to the 2005 opinion and partial weight to the 2015 and 2017 opinions. Tr. 25-26. The ALJ gave different reasons for rejecting each of the opinions. *Id.* The court addresses each of Dr. Cole's opinions in turn.

### A.    Dr. Cole's 2005 Opinion

The ALJ gave no weight to Dr. Cole's 2005 opinion, finding that it "significantly pre-dates the alleged onset date, as well as the prior administrative determination dated May 2010." Tr. 26. This was a specific, legitimate reason for rejecting the doctor's opinion; thus, the ALJ properly rejected Dr. Cole's 2005 opinion.

### B.    Dr. Cole's 2015 Opinion

 In 2015, Dr. Cole opined that "if [plaintiff] pursues a vocational placement in the near future, then it is presumed that his: physical problems associated with colitis/bathroom needs would be the primary factors, which would impact his overall level of vocational success." Tr. 555. The ALJ gave only partial weight to Dr. Cole's 2015 opinion because the doctor "expressly

stated that [plaintiff's] physical condition was his primary problem with respect to work," but "[t]his is outside of Dr. Cole's expertise[.]"  Tr. 25.

However, one does not need to be a medical expert to recognize that a condition that causes a person to rush to the bathroom six to twelve times per day would interfere with his ability to work.  Indeed, there is a no dispute that plaintiff's colitis is one of the primary factors impacting plaintiff's ability to work.  Additionally, Dr. Cole concluded that "further medical evaluation is suggested to determine the client's specific physical limitations." Tr. 555-56.  This reflects Dr. Cole's acknowledgement that despite it being generally apparent that plaintiff's colitis would present an obstacle to his employment, someone with more expertise needed to determine the extent that the colitis would limit plaintiff.  As such, the ALJ improperly rejected Dr. Cole's 2015 opinion.

### C.     Dr. Cole's 2017 Opinion

The ALJ gave partial weight to Dr. Cole's 2017 opinion.  Tr. 24.  The ALJ rejected Dr. Cole's assessment that plaintiff would have moderate limitations interacting with supervisors and co-workers, finding that the record showed plaintiff could spend time with family members and had no particular problem with authority figures.  Tr. 25, 565.  The ability to "spend time" with family members does little to demonstrate that a person can interact appropriately with supervisors and co-workers.  *See Whitney W. v. Berryhill*, No. 6:17-cv-00972-CL, 2019 WL 1877973, at *6 (D. Or. Mar. 28, 2019), *report and recommendation adopted* 2019 WL 1877963 (D. Or. Apr. 26, 2019) (rejecting the Commissioner's argument that a claimant's ability to maintain a relationship with family conflicted with limitations in her ability to interact with supervisors, and noting that the argument was "baffling").  Furthermore, consistent with Dr.

Cole's opinion, plaintiff's therapist observed that plaintiff had difficulty with social interactions, and plaintiff's family reported that he was socially inept. Tr. 339, 341, 682.

While the ALJ asserted that plaintiff had no problem with authority figures, in reality, plaintiff reported that he gets along with authority figures "as best as [he] can." Tr. 281. This falls short of establishing that plaintiff is capable of getting along with authority figures and certainly implies that he has some degree of limitation in that area. Given plaintiff's documented difficulties with social interaction, Dr. Cole's assessment is supported by the record.

The ALJ gave little weight to Dr. Cole's opinion that plaintiff had marked limitation in the ability to respond appropriately to usual work situations and to changes in a routine work setting. Tr. 25. In support of this finding, the ALJ relied on Dr. Cole's examination notes, which reflected that plaintiff "presented with good mood, congruent affect, good eye contact, pressured but intelligent speech, and was overall engaged and cooperative." *Id.* It is unclear how any of those observations demonstrate an ability to respond appropriately to changes in a work setting. The ALJ also cited Dr. Cole's observations that plaintiff's insight and judgment were "fair." *Id.* However, contrary to the ALJ's conclusion, deficits in insight and judgment, if anything, would seem to support Dr. Cole's assessment. Additionally, Dr. Cole's conclusion is supported by the assessment of plaintiff's therapist that plaintiff had an "inflexible adherence to routines." Tr. 682. Dr. Cole's opinion is further supported by the testimony of plaintiff and Charlotte S., who stated that plaintiff could not handle changes in his routine. Tr. 282, 299.

The ALJ also gave little weight to Dr. Cole's responses on the check-box form because they were not supported by further explanation. Tr. 25. However, the ALJ's characterization is not entirely accurate. In the spaces where Dr. Cole was prompted to provide further explanation, he referred back to his psychodiagnostic evaluation. Tr. 565. His evaluation included the

Vineland Adaptive Behavior Scales examination, which reflected that plaintiff had a low adaptive functioning level in communication and socialization. Tr. 561. The examination results support Dr. Cole's assessment that plaintiff would be limited in his ability to interact with supervisors and co-workers. Dr. Cole further observed in his evaluation that plaintiff suffers from anxiety around unfamiliar people and is "rather inflexible" in his routines, which supports the conclusion that plaintiff would not be able to respond appropriately to changes in the work setting. Tr. 559-60.

Finally, the ALJ gave less weight overall to Dr. Cole's opinion because he "inappropriately opined that the claimant's physical condition (which is outside of Dr. Cole's expertise) would be a primary factor affecting his vocational success." Tr. 25. However, as discussed above, this was not a proper basis for rejecting Dr. Cole's opinion. Therefore, the ALJ improperly rejected Dr. Cole's 2017 opinion.

## III.    Lay Witness Testimony

Lay witness testimony regarding the severity of a claimant's symptoms or how an impairment affects a claimant's ability to work is competent evidence that an ALJ must take into account. *Nguyen*, 100 F.3d at 1467. To reject such testimony, an ALJ must provide "reasons that are germane to each witness." *Rounds v. Comm'r*, 807 F.3d 996, 1007 (9th Cir. 2015) (quoting *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012) (remaining citation omitted)). Further, the reasons provided also must be "specific." *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234 (9th Cir. 2011) (citing *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009)). However, where the ALJ has provided clear and convincing reasons for rejecting the claimant's symptom testimony, and the lay witness has not described limitations beyond those

alleged by the claimant, the ALJ's failure to provide germane reasons for rejecting lay testimony is harmless. *Molina*, 674 F.3d at 1121-22.

The ALJ gave "little weight" to the lay witness statements of plaintiff's stepmother, plaintiff's stepbrother, and Charlotte S. Tr. 27. The ALJ found that "[m]ost of the issues they describe are long-term issues that clearly did not preclude the claimant from working in the past (for employers, such as Wal-Mart, other than [plaintiff's] father)." *Id.* The ALJ's reasons for rejecting the lay-witness testimony are vague and not "specific." *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006). It is not clear what "long-term issues" the ALJ was referencing. Despite working for Wal-Mart in 2007, 2008, and 2009, the record reflects that plaintiff was eventually fired due to his worsening ulcerative colitis because his trips to the bathroom became too frequent. Tr. 51, 542.

The record also reflects that plaintiff's mental impairments worsened over time. Notably, in 2005, Dr. Cole diagnosed major depressive disorder and anxiety disorder, but in 2017, Dr. Cole additionally diagnosed hoarding disorder and autism spectrum disorder, requiring substantial support. Tr. 348, 561. Additionally, in 2005, Dr. Cole determined that plaintiff was capable of managing his own finances, but in 2017 opined that plaintiff would need someone to assist him in managing his funds. Tr. 349, 562. Charlotte S. corroborated plaintiff's mental and physical impairments worsened over the years. Tr. 297. Therefore, even if plaintiff had the same impairments when he was working at Wal-Mart, the record reflects that those impairments have worsened.

The ALJ also found that the lay witnesses "primarily describe[d] issues other than ulcerative colitis as limiting [plaintiff's] ability to work" but plaintiff "alleges that he is mainly limited by that condition." Tr. 27. However, the fact that plaintiff minimizes his mental

impairments is consistent with the lay witness testimony.  The lay witnesses explained that plaintiff has a tendency to overestimate his mental abilities,  Tr. 300, 337, 341.  Indeed, plaintiff's insight and judgment were repeatedly assessed as fair, suggesting that he is not well-positioned to adequately assess his own mental deficits.  Tr. 642, 675, 685, 698.  Plaintiff has acknowledged his mental limitations to some extent.  Plaintiff admitted that he struggles to independently keep his clothes and house clean.  Tr. 279.  He also reported that he was unable to handle his own finances, that he is "socially inept," and has "never really been able to socialize." Tr. 280-81.  Moreover, while the lay witnesses may have "primarily described" plaintiff's mental impairments, they also explained that plaintiff's ulcerative colitis has resulted in a lack of bowel control, causing him to frequently use the bathroom or have accidents, and making it impossible for him to travel and difficult to go to appointments.  Tr. 294, 298, 336, 338-40.

Finally, the ALJ found that while plaintiff reported six bowel movements per day, that was "highly inconsistent" with plaintiff's stepbrother's report that plaintiff goes to the bathroom every "15 minutes or so."[4]  Tr. 27, 336.  As discussed above, the fact that plaintiff was having six bowel movements per day does not mean that he was using the bathroom only six times per day. In fact, the record reflects that his bathroom use was significantly more frequent.  Moreover, the stepbrother's vivid and detailed report of plaintiff's depression, mental impairments, lack of judgment, and inability to care for himself was otherwise consistent with the record in this case. Tr. 336-37.  Thus, the ALJ erred in rejecting the testimony of the lay witnesses.

---

[4] Plaintiff's stepbrother also reported that plaintiff "usually stays in [the] bathroom 10-30 mins." Tr. 336.

## IV.    Remand

When a court determines the Commissioner erred in some respect in making a decision to deny benefits, the court may affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for a rehearing." *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (quoting 42 U.S.C. § 405(g)). In determining whether to remand for further proceedings or immediate payment of benefits, the Ninth Circuit employs the "credit-as-true" standard when the following requisites are met: (1) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, (2) the record has been fully developed and further proceedings would serve no useful purpose, and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the plaintiff disabled on remand. *Garrison*, 759 F.3d at 1020. Even if all of the requisites are met, however, the court may still remand for further proceedings, "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled[.]" *Id.* at 1021.

Here, the first requisite of the *Garrison* test is met. As discussed above, the ALJ improperly discounted plaintiff's subjective symptom testimony, erroneously assessed the medical opinion of Dr. Cole, and improperly rejected the lay witness testimony of plaintiff's stepmother, plaintiff's stepbrother, and Charlotte S.

Regarding the second factor, in assessing whether the record is fully developed, the court looks to whether there are "*significant factual conflicts* in the record between [the claimant's] testimony and objective medical evidence." *Treichler*, 775 F.3d at 1104 (emphasis added). The Commissioner argues that significant factual questions remain because Dr. Maveety stated, in 2014, that there was no evidence of active colitis, Dr. Volpi concluded that plaintiff could work

with a special diet and restroom services, and plaintiff was able to work for his father and other employers in the past. Def. Br. 18, ECF #18.

However, as discussed above, while Dr. Maveety noted that he could not find objective evidence of active ulcerative colitis, a previous colonoscopy had shown active colitis. Tr. 598. Additionally, plaintiff was still experiencing the symptoms of ulcerative colitis, Dr. Maveety diagnosed plaintiff with it, and he continued to treat plaintiff for it. Tr. 419. Furthermore, within the next two months, Dr. Selinger, Dr. Coleman, and Dr. Volpi all diagnosed plaintiff with ulcerative colitis. Tr. 545, 574, 577. Later that year, Dr. Smith also diagnosed ulcerative colitis. Tr. 587. The following year, Dr. Niskanen observed that the results of plaintiff's colonoscopy were consistent with ulcerative colitis, and both Dr. Moisa and Dr. Cohen diagnosed it. Tr. 572, 591, 595. Accordingly, notwithstanding Dr. Maveety's 2014 treatment note, there was a clear medical consensus that plaintiff was suffering from ulcerative colitis.

While Dr. Volpi opined that a special diet and restroom services would be necessary for plaintiff to work, he did not go as far as to say such conditions would be sufficient. Tr. 598. Furthermore, as previously explained, Dr. Volpi never prescribed or even recommended that plaintiff implement the special diet on an ongoing basis, and plaintiff's explanation of the diet indicates that it would be unhealthy to do so.

Finally, with regard to plaintiff's ability to work prior to the relevant period, the record reflects that plaintiff's physical and mental conditions subsequently declined. Indeed, as previously noted, even though plaintiff was able to work for Wal-Mart, he was eventually let go because he was using the bathroom too frequently. Tr. 542. With regard to working for his father delivering newspapers, he only worked part-time and that job ended in 2002. Tr. 243,

336, 542.  Thus, plaintiff's ability to work prior to the relevant period does not present a

significant factual conflict.

As to the third requisite, if the discredited evidence were credited as true, the ALJ would

be required to find plaintiff disabled on remand because Dr. Cole determined that plaintiff would

be seriously limited in his ability to cope with changes in a routine work setting.  Pursuant to

SSR 85-15,

> [t]he basic mental demands of competitive, remunerative, unskilled work include
> the abilities (on a sustained basis) to understand, carry out, and remember simple
> instructions; to respond appropriately to supervision, coworkers, and usual work
> situations; and to deal with changes in a routine work setting.  A substantial loss
> of ability to meet *any* of these basic work-related activities would severely limit
> the potential occupational base.  This, in turn, would justify a finding of
> disability[.]

(emphasis added).  Dr. Cole's opinion is supported by the assessment of plaintiff's therapist that

plaintiff had an "inflexible adherence to routines."  Tr. 682.  Plaintiff and Charlotte S. also

reported that plaintiff could not handle changes in his routine "at all."  Tr. 282, 299.  Therefore,

plaintiff's "substantial loss of ability" to deal with changes in a routine work setting "justif[ies] a

finding of disability."  SSR 85-15.

Additionally, plaintiff's bathroom needs resulting from his ulcerative colitis render him

disabled.  The ALJ found that plaintiff would require ready access to a bathroom and three

unscheduled bathroom breaks of five minutes each.  Tr. 19.  The VE testified that three five-

minute breaks would not be disabling, but it was "edging very, very close to" being disabling.

Tr. 82.  The VE explained that even if plaintiff was using the bathroom for a total of 20 to 25

minutes outside of scheduled breaks it would be "very difficult to maintain competitive

employment," and if plaintiff was using the bathroom for 30 minutes outside of scheduled breaks

then competitive work would definitely be ruled out.  *Id.*  The record reflects that throughout the

relevant period, even when plaintiff's colitis was well-controlled, he was having six bowel movements per day. Tr. 418, 428, 431, 434, 437, 489, 493, 499, 502, 599, 602. Moreover, as explained above, plaintiff was generally taking two trips to the bathroom for every bowel movement to prevent accidents and because "he has problems differentiating whether or not he has flatus or diarrhea." Tr. 70, 72-73, 418, 428, 484, 542.

In sum, even when his colitis was managed, plaintiff still needed to use the bathroom twelve times per day. During flare-ups, plaintiff would have up to twelve bowel movements per day, which would require more than twelve trips to the bathroom. Tr. 413, 441, 574, 577. Therefore, the record does not support the ALJ's conclusion that three unscheduled bathroom breaks would adequately account for plaintiff's bathroom needs. Moreover, in addition to underestimating the number of breaks that plaintiff would require, the ALJ appears to have underestimated the length of the breaks. Plaintiff testified that he is in the bathroom so much during the morning that by the time he is "semi-empty, pretty much half the day is gone." Tr. 73. This reflects that plaintiff's bathroom breaks often last for significantly more than just five minutes. Spending such a substantial amount of time in the bathroom, to the point that "pretty much half the day is gone," would clearly exceed the 20-30 minutes in the bathroom that the VE testified would be disabling. Thus, plaintiff's excessive bathroom breaks would preclude competitive employment. Tr. 73, 82.

Because these arguments are dispositive of this matter, the court "decline[s] to reach [plaintiff's] alternative ground[s] for remand."[5] *Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012).

_____

[5] Plaintiff additionally argues that the ALJ improperly performed the Listings analysis and erroneously crafted the RFC to include limitations which would be considered accommodations under the ADA.

Where each of the credit as true factors is met, only in "rare instances" does the record as a whole leave "serious doubt as to whether the claimant is actually disabled." *Revels v. Berryhill*, 874 F.3d 648, 668 n.8 (9th Cir. 2017) (citing *Garrison*, 759 F.3d at 1021). This case is not one of those "rare instances."

## CONCLUSION

For these reasons, the decision of the Commissioner is REVERSED and this matter is REMANDED for the immediate calculation and payment of benefits.

DATED August 6, 2019.

_/s/ Youlee Yim You_
Youlee Yim You
United States Magistrate Judge
